IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

ELAINA WOODS                                                                    PLAINTIFF

                    v.                    Civil No. 07-2065

GREGORY NAPIER; JOHNNY
BOLINGER; LOU DOE;
and MIKE CONGER                                                              DEFENDANTS

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983. She proceeds *pro se* and *in forma pauperis*.

The events at issue in this lawsuit occurred on April 19, 2007. Plaintiff maintains her constitutional rights were violated when she was falsely arrested by Fort Smith Police Officers Gregory Napier and Johnny Bolinger and excessive force was used against her during her arrest. Following her arrest, she was taken to the hospital where she maintains she was sexually molested by Lou Doe, an unidentified male, who was helping restrain her while she was forcibly given an injection. Finally, she also maintains that unidentified officers at the Sebastian County Adult Detention Center utilized pepper spray against her.

Separate Defendants Gregory Napier and Johnny Bolinger filed a summary judgment motion (Doc. 18). Separate Defendant Mike Conger also filed a motion for summary judgment (Doc. 24). To assist plaintiff in responding to the summary judgment motions, a questionnaire was propounded (Doc. 29). Plaintiff was given until August 11th to respond to the

questionnaire. Plaintiff sought (Doc. 30) and was given an extension of time to respond to the questionnaire (Doc. 31). Plaintiff filed a timely response on August 28th (Doc. 32). The summary judgment motions are before the undersigned for issuance of this report and recommendation.

## **Background**

On April 19, 2007, Johnny Bolinger was a police officer for the City of Fort Smith. *Plaintiff's Response* (Doc. 32)(hereinafter *Resp.*) at ¶ 1(A). Steven Hodges is a police officer for the City of Fort Smith and has been for several years. *Id.* at ¶ 1(B). Gregory Napier has been a police officer with the City of Fort Smith since 1998. *Id.* at ¶ 1(C). Alan Haney is a captain with the City of Fort Smith Police Department and supervises the Office of Professional Standards. *Id.* at ¶ 1(D).

On April 19, 2007, at about 3:00 p.m., Bolinger along with Hodges was conducting an accident investigation at the intersection of Rogers Avenue and Greenwood in Fort Smith. *Resp.* at ¶ 3(A). At approximately 3:10 p.m. Napier was dispatched to the intersection of Rogers Avenue and Greenwood to assist Bolinger in either investigating the accident or by handling traffic control. *Id.* at ¶ 3(B).

Bolinger observed Woods screaming out loud and pounding with clinched fists on the crosswalk button. *Bolinger's Affidavit* at ¶ 1. Woods was repeatedly yelling: "I need to get across." *Id.* Hodges was interviewing one of the people involved in the accident. *Hodges's Affidavit* at ¶ 2. According to Hodges, he did not by word or action give Woods permission to run across Rogers Avenue into moving traffic. *Id.*

Woods asserts she was attempting to cross the street because she was running late to pick her daughter up from school. *Resp.* at ¶ 4(A). She maintains Hodges walked over to her to let her know that she was using the wrong pole button to cross. *Id.* at ¶ 4(B). Woods indicates she explained her situation to him. *Id.* When the path was clear to cross, Woods states she asked permission to go and he "acknowledged yes by head movement." *Id.*

According to Bolinger, he started Woods' way to see if she needed assistance but she suddenly darted into Rogers Avenue zig zagging and nearly getting hit by cars headed in both directions. *Bolinger's Affidavit* at ¶ 1. Bolinger managed to get traffic stopped so he could check on Woods and see if there was an emergency. *Resp.* at ¶ 6; *Bolinger's Affidavit* at ¶ 2. When he got across Rogers Avenue, Bolinger, who was in uniform, identified himself as a police officer, and verbally asked Woods to stop. *Id.*

Bolinger maintains Woods stopped and screamed at him that the "old man told her that she could cross." *Bolinger's Affidavit* at ¶ 2. Woods asserts she also stated she had to go because she was running late to pick up her daughter. *Resp.* at ¶ 7. Woods indicates she was breathing heavily from running. *Id.*

Because Woods was not making sense, Bolinger asked her to calm down and tell him what was happening. *Bolinger's Affidavit* at ¶ 2. Woods asserts she was calm in explaining. *Resp.* at ¶ 8. At the same time, she indicates she was trying to catch her breath since she had been running. *Id.*

She turned away from Bolinger and began to hurry away. *Bolinger's Affidavit* at ¶ 2. Woods states it was not until after she explained to Bolinger "what was up" that she turned to

AO72A
(Rev. 8/82)

start running again. *Resp.* at ¶ 9. A short time later, Bolinger caught up with Woods. *Resp.* at ¶ 10; *Bolinger's Affidavit* at ¶ 2. Based on his police experience, Bolinger believed Woods was intoxicated. *Id.*

Woods maintains she was within her rights. *Resp.* at ¶ 10. She states Bolinger asked her to stop. *Id.* She stopped. *Id.* He asked her to explain. *Id.* She explained. *Id.* She then stated she had to go and turned and left. *Id.* She maintains the first violation of her rights occurred when he caught up with her later and grabbed her arm. *Id.*

At times Woods was drooling, growling, and babbling. *Resp.* at ¶ 11; *Bolinger's Affidavit* at ¶ 2. Woods states the moment Bolinger put his hands on her she began to yell and scream. *Resp.* at ¶ 11. She flailed her arms, striking at Bolinger with her purse. *Bolinger's Affidavit* at ¶ 2. Woods agrees she flailed her arms but "states never once did I strike at him." *Resp.* at ¶ 12.

According to Bolinger, he could make out something about a child at Fairview Elementary, which was a considerable distance from Rogers Avenue and Greenwood, but for the most part Woods was unintelligible and unable to tell Bolinger why she was acting out. *Bolinger's Affidavit* at ¶ 2. Woods, however, contends Bolinger knew the reason she was and had been running for sometime. *Resp.* at ¶ 13. She states he knew she was late in picking up her daughter from school. *Id.* Woods indicates this was why she was hurrying and acting out. *Id.* By detaining her, Bolinger only caused her to be later and made her anger grow more. *Id.*

Officer Gregory Napier came to assist Bolinger. *Resp.* at ¶ 14(A). When Napier arrived, he saw Bolinger trying to subdue Woods on the southwest side of Rogers Avenue. *Id.* at ¶ 14(B). He saw Woods struggling to free herself from handcuffs. *Id.* She was attempting to get away.

AO72A
(Rev. 8/82)

*Id.* When Napier approached, he observed that at times Woods was drooling, growling, and in Napier's opinion Woods appeared to be under the influence of some intoxicant or controlled substance. *Napier's Affidavit* at ¶ 1.

Together Bolinger and Napier were able to subdue Woods. *Resp.* at ¶ 15. At one point, Woods managed to get out of a handcuff. *Id.* at ¶ 16. Attempting to get Woods into cuffs, Bolinger and Napier forced her hands behind her back through police taught methods of wrist lock, and arm bar. *Bolinger's Affidavit* at ¶ 2. Bolinger believes he may have placed a knee, also a police taught method, between Woods' legs in order to gain leverage and control as she was struggling. *Id.* Napier grabbed Woods' left arm and leaned her over a short brick wall. *Id.*

Napier held Woods' arm with a wrist lock while Bolinger put the cuff on her other arm. *Napier's Affidavit* at ¶ 2. Bolinger may have pressed his knee against Woods as Bolinger and Napier had been trained to obtain leverage and some additional control. *Id.*

According to Woods, both Napier and Bolinger tackled her and slammed her to the ground. *Resp.* at ¶ 17(A). She states Bolinger then shoved his knee between her legs hard after laying his whole body on top of her. *Id.* at ¶ 17(A) and ¶ 17(C).

With respect to Napier grabbing her arm, Woods maintains Napier extended her arm extensively above her back while slamming her over the wall. *Resp.* at ¶ 17(B). She also indicates Bolinger was still laying on top of her pinning her down when the cuffs were put on her. *Id.* at ¶ 17(C).

AO72A
(Rev. 8/82)

At some point Woods urinated, soiling her own clothes and those of Bolinger. *Resp.* at ¶ 17(E). Woods indicates she had been "holding it in" for sometime because she didn't want to stop running until she got her daughter. *Id.* At that point, she would use the restroom. *Id.*

According to Bolinger and Napier, as Woods was taken to the patrol car, she kicked at the car denting it. *Bolinger's Affidavit* at ¶ 2; *Napier's Affidavit* at ¶ 2. Woods denies that she kicked the car. *Resp.* at ¶ 18. She also states that Napier did not put anything on the citation about her kicking the car. *Id.* She states that was falsely added four months later. *Id.* Woods attaches a copy of the citation she was given by Napier. *Resp.* at page 14. It indicates she was cited for the offenses of fleeing apprehension, refusal to submit to arrest, public intoxication, and disorderly conduct. *Id.*

Bolinger prepared an arrest report and a use of force report. *Resp.* at ¶ 19 & ¶ 22; *Exhibits* 1 and 3 to *Bolinger's Affidavit*. According to Bolinger, Woods received minor bruising from the arrest. *Bolinger's Affidavit* at ¶ 3. According to Woods, she received major bruising from the arrest. *Resp.* at ¶ 20.

Neither Napier or Bolinger touched Woods sexually. *Resp.* at ¶ 23. Neither Napier or Bolinger injected her with any substance. *Id.* at ¶ 24. Neither Bolinger nor Napier pepper sprayed her. *Id.* at ¶ 25.

Woods was convicted of disorderly conduct, refusal to submit to arrest, and criminal mischief in the Sebastian County District Court as a result of her conduct on April 19, 2007. *Resp.* at ¶ 26. Woods maintains the fleeing apprehension and public intoxication charges were

AO72A
(Rev. 8/82)

ultimately dismissed. *Id.* She asserts these were the main basis they claimed she was arrested and she proved her case and won on these charges. *Id.* at ¶ 26 & ¶ 27.

The disorderly conduct, refusal to submit to arrest, and criminal mischief convictions have not been reversed, overturned, or otherwise held to be invalid. *Id.* at ¶ 27(A). Woods did not appeal the convictions. *Id.* at ¶ 27(B).

Napier transported Woods to the Sebastian County Adult Detention Center (SCADC). *Resp.* at ¶ 28. According to Napier, during the trip to the SCADC, Woods talked constantly but somewhat incoherently. *Napier Affidavit* at ¶ 3. Woods maintains she stated clearly that she wanted to be taken to the hospital for a blood test to prove she was "clean."

When Napier got Woods to the SCADC, Deputy Taulbee took one look at her and believed she was under the influence of a controlled substance and would not accept her without a medical okay. *Resp.* at ¶ 30(A). Woods indicates there were ten or twelve people in the sallyport area and all believed that she was high. *Id.* Woods states she said over and over that she wanted to go to the hospital to have blood work done to prove she was clean and there was no reason for her being arrested. *Id.*

Napier talked to his supervisors Sgt. John Classen and Captain Mark Hallum and then took Woods to Sparks Regional Medical Center where medical personnel, including Dr. Carlson, expressed the opinion that she was on something. *Resp.* at ¶ 30(B). When she arrived at the hospital, Woods refused to sit down. *Id.* at ¶ 30(D). Woods asserts she was not going to sit down until her blood test was done. *Id.*

-7-

Woods kept talking gibberish and at one point said she was telepathic and was having her monthly cycle. *Napier's Affidavit* at ¶ 3; *Resp.* at ¶ 30(E)(was on monthly cycle). Dr. Carlson said Adevan would help. *Napier's Affidavit* at ¶ 3. With the assistance of five to six Sparks' staff members, Woods was given a shot to calm her down. *Id.* Her blood was drawn. *Resp.* at ¶ 30(G); *Napier's Affidavit* at ¶ 3.

According to Woods, when she was pinned down and given the shot at the hospital, Lou Doe slid his "hand further down the front of [her] pants and his fingers slid up into the folds of my privates." *Resp.* at ¶ 55. Woods states she immediately turned her head and bit down hard on his finger on his other hand which was right next to Napier's hand pinning her down. *Id.* Woods asserts that Napier told her loudly not to do that again–meaning that she should not bite his finger again. *Id.* Woods states she replied that the man had just slid his hand into her privates. *Id.* She asserts she yelled over and over again that the man had crossed the line and touched her sexually. *Id.* Woods maintains Napier is lying when he says he doesn't know who touched her sexually. *Id.*

The blood test results did not show the presence of alcohol or any controlled substance. *Resp.* at page 21. After the shot and her blood being drawn, Woods calmed down enough for Napier to take her back to the SCADC. *Resp.* at ¶ 30(I); *Napier's Affidavit* at ¶ 3. Napier booked Woods into the SCADC and left her in the custody of jail personnel. *Resp.* at ¶ 30(J).

Napier completed a use of force report. *Resp.* at ¶ 31; *Napier's Affidavit* at ¶ 4 and *Exhibit* 1 to *Napier's Affidavit*. Haney oversees reviews of incidents involving the use of force, or alleged use of force, or other wrongdoing by Fort Smith police officers. *Resp.* at ¶ 32. Haney

AO72A
(Rev. 8/82)

is familiar with the records relating to Woods' arrest on April 19th and obtained copies of documents related to her from the Sebastian County Courthouse and the SCADC. *Id.* at ¶ 33. An internal review by the Fort Smith Police Department of Woods' arrest concluded that reasonable force in keeping with departmental policies was used in effecting her arrest and that proper procedures were used in transporting her and booking her into the SCADC. *Resp.* at ¶ 34 (agree that his decision was based on their version); *Haney's Affidavit* at ¶ 1).

The use of a knee between an uncooperative detainee's legs is a defensive tactic for which departmental training had been provided to Napier and Bolinger. *Haney's Affidavit* at ¶ 2. The police department use of force policy sets forth the type and degree of levels of control that may be used to overcome resistance and to control persons who are in custody and to prevent escape. *Resp.* at ¶ 37; *Haney's Affidavit* at ¶ 2. Level 1 calls for identification of authority. Level 2 for verbal direction or command and Level 3(a) for soft empty hand control (grabbing or wrestling). *Resp.* at ¶ 38; *Haney's Affidavit* at ¶ 2.

According to Fort Smith Police Department's policy and procedure regarding prisoner handling and transportation, if a prisoner is combative, or might escape, the policy recommends the use of handcuffs during transport. *Resp.* at ¶ 39(A); *Haney's Affidavit* at ¶ 3. Woods was transported to Sparks because of her strange behavior. *Resp.* at ¶ 39(C); *Haney's Affidavit* at ¶ 3. Woods further points out that she requested transport to the hospital. *Resp.* at ¶ 39(C).

When Woods was first presented at the SCADC, she was sweating, banging her head on the cage of the patrol car, talking erratically, and rapidly. *Resp.* at ¶ 40; *Haney's Affidavit* at ¶ 4. She was denied admission to SCADC. *Id.* Woods states she was sweating and banging her

AO72A
(Rev. 8/82)

head because she was mad because they didn't believe her. *Resp.* at ¶ 40. However, she states she was very clear about requesting to go to the hospital to prove herself. *Id.*

The nurse at the SCADC felt Woods was very aggressive, in a state of paranoid delusions, grossly tangential, quoting the Bible over and over, and unable to identify a person, place or situation. *Resp.* at ¶ 41; *Haney's Affidavit* at ¶ 4. Woods denied being on drugs but had urinated on herself. *Id.*

Woods asserts this was when she first got to the sallyport at the SCADC before she went to the hospital. *Resp.* at ¶ 41. She states she was mad because she had done nothing. *Id.* She indicates she stated over and over the only thing she was high on was the Holy Spirit. *Id.* She maintains that the part about her being unable to identify a person, place or situation is a lie. *Id.*

The offenses listed on her booking record were contempt–failure to pay fine, disorderly conduct, public intoxication, refusal to submit to arrest, fleeing apprehension, and criminal mischief--first degree. *Haney's Affidavit* and *Exhibit* 4 to *Haney's Affidavit*. The failure to pay a fine was based on an existing warrant. *Resp.* at ¶ 43. Woods was booked in on April 20th at 3:29 p.m. *Haney's Affidavit* and *Exhibit* 4 to *Haney's Affidavit*. The court date was listed as April 24th on all charges. *Id.*

On Woods' intake questionnaire it was noted she was disheveled, agitated, withdrawn, and appeared intoxicated. *Haney's Affidavit* and *Exhibit* 4 to *Haney's Affidavit*. Woods notes the questionnaire was not completed until the 20th and this was after she was given a shot. *Resp.* at ¶ 42. She also maintains she was pepper sprayed. *Id.* She stated she was not agitated. *Id.* Instead, she states she could barely function or focus at the time. *Id.*

AO72A
(Rev. 8/82)

Mike Conger is the jail administrator of the SCADC and occupied that position on April 19, 2007. *Resp.* at ¶ 47. Conger has no knowledge of anyone using pepper spray on Woods on April 19th. (Doc. 26) at ¶ 3; *Resp.* at ¶ 48. Woods does not maintain Conger was personally involved in the use of pepper spray against Woods. *Resp.* at ¶ 54. Conger has been unable to identify any officers who utilized pepper spray against Woods on April 19th. (Doc. 26) at ¶ 5. Amanda Sowa was the officer who booked her in. *Resp.* at ¶ 52.

There are no incident reports regarding pepper spray being used on Woods. (Doc. 26) at ¶ 5. The officer who booked Woods in, Amanda Sowa, including supervising Woods' shower, has no recollection of any incident involving Woods and pepper spray during her entire book-in process. (Doc. 26) at ¶ 5.

Woods submitted no grievances about being pepper sprayed. *Resp.* at ¶ 51. She learned about the grievance procedure from her cell mates and intended to submit a grievance but was released before she submitted one. *Id.* She maintains her two cell mates witnessed her having problems with her eyes following the application of the pepper spray. *Resp.* at ¶ 53. She states she also asked them how long her eyes would be burning and having a discharge. *Id.*

Woods questions what means Conger used to attempt to identify the officers allegedly involved. *Resp.* at ¶ 49. She states surely if Conger reviewed tapes of the inside of the SCADC he will see the officers who escorted her from the shower and pepper sprayed her. *Id.* at ¶ 48.

She also maintains Sowa knows exactly who pepper sprayed her. *Resp.* at ¶ 50. After Woods' shower, she states she was escorted a short distance and shoved into a room. *Id.* When she caught her balance and turned around asking why they did that, Woods maintained she was

pepper sprayed. *Id.* Because she was still "pretty loopy" from the shot, Woods states everybody was still "fuzzy" and she couldn't clearly see the officers that escorted her from the shower. *Id.* After being sprayed, Woods states she was unable to see anyone. *Id.* As Sowa supervised Woods' shower, Woods maintains she would either know who escorted Woods or even was one of the officers who personally escorted her. *Id.*

Woods maintains Bolinger used excessive force against her on April 19th. *Resp.* at ¶ 45. She maintains he grabbed her, yanked her, pulled her, tackled her, and slammed her to the ground. *Id.* The moment she felt her rights were being violated Woods indicated she started resisting first verbally and then physically. *Id.* She states she flailed her arms up in protest and her arm came out of the cuff. *Id.* Woods asserts she suffered injuries to her arm from it being extended behind her back and up over her head. *Id.* She also indicates she had bruises all over her body. *Id.* Finally she alleges she suffered mental injuries as well as public humiliation from being tackled in broad daylight at a busy intersection by two male officers, slammed to the ground, a leg shoved between hers and made to urinate on herself. *Id.*

Woods also maintains Napier used excessive force against her on April 19th. *Resp.* at ¶ 46. She maintains he grabbed, yanked, pulled, tackled, and slammed her to the ground over the wall. *Id.* She states she started resisting him the moment she felt her rights were being violated. *Id.* Woods indicates she suffered injuries to her arm from it being extended behind her back up over her head. *Id.* She also states she suffered injuries when he assisted at the hospital in pinning her down so they could give her a shot that she had refused from the start. *Id.*

Woods indicates she sought medical treatment but mainly in the form of a blood test to prove she was clean. *Resp.* at ¶ 45 & ¶ 46 . Woods indicates she did, however, make it known to hospital staff about the injury to her arm and her bruising but the injuries were untreated. *Id.* The bruising took about two weeks to all go away. *Id.* As for her arm, she indicates it has been over a year and she still has problems with pain in it. *Id.*

### **Summary Judgment Standard**

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a . . . verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

AO72A
(Rev. 8/82)

## Discussion

As noted above, there are currently two motions for summary judgment pending. We will address the motions separately.

### *The Motion for Summary Judgment filed by Mike Conger*

Mike Conger contends he is entitled to judgment as a matter of law. I agree. First, Mike Conger, the jail administrator, was named as a defendant for the sole purpose of identifying the officers who allegedly used pepper spray against Woods on April 19, 2007. Conger has been unable to identify the officers allegedly involved in the use of pepper spray because there are no incident reports regarding the use of pepper spray against Woods and the booking officer Sowa has no recollection of any such incident occurring. Second, Woods failed to exhaust her administrative remedies prior to filing suit.

As amended by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a) mandates exhaustion of available administrative remedies before an inmate files suit. Section 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The Supreme Court in *Booth v. Churner*, 532 U.S. 731, 738-39, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001) held that "exhaustion is required where administrative remedies are available even if the available administrative remedies do not provide the precise, or full, relief sought." *Walker v. Maschner*, 270 F.3d 573, 577 (8th Cir. 2001).

AO 72A
(Rev. 8/82)

There are no records of Woods filing any grievances or medical requests about her being pepper sprayed on April 19, 2007. When asked whether she submitted any grievances, she stated she was finding out information from her two cell mates and learning the "do's & don'ts of being in population." *Resp.* at ¶ 51. She indicated she was going to file a grievance but then she was released. *Id.* Woods' claim based on the alleged April 19th pepper spraying cannot proceed because she did not exhaust his administrative remedies. *See Jones v. Bock*, 549 U.S. 199, ___, 127 S. Ct. 910, 918-23, 166 L. Ed. 2d 798 (2007)(unexhausted claims cannot be brought in court or considered).

### ***The Motion for Summary Judgment filed by Gregory Napier and Johnny Bolinger***

Defendants first maintain they acted with probable cause in arresting Woods initially for suspected public intoxication and disorderly conduct and subsequently for refusal to submit to arrest, fleeing apprehension, and criminal mischief. Further, they maintain that the force used in subduing Woods was reasonable and necessary under the circumstances then existing. Finally, they maintain Woods' convictions on the charges of disorderly conduct, refusal to submit to arrest, and criminal mischief preclude any claim of false arrest.

### ***The False Arrest Claims***

To the extent Woods claims she was "falsely" arrested, those claims are subject to dismissal. Under *Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994), a § 1983 claim that would necessarily imply the invalidity of a conviction is premature.

In *Heck*, the Supreme Court held that:

in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would

render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Heck*, 512 U.S. at 487, 114 S. Ct. at 2372-73(footnotes omitted).

Thus, Woods' false arrest claims are simply not cognizable under § 1983 because of her convictions on the disorderly conduct, refusal to submit to arrest, and criminal mischief charges. Those charges were brought against her as a result of her conduct on April 19th. The convictions have not been reversed, set aside, or otherwise held invalid.

*Excessive Force*

Woods also contends Napier and Bolinger violated her constitutional right to be free from excessive force during the course of her arrest. "All claims that law enforcement officers have used excessive force in the course of an arrest or investigatory stop of a free citizen should be analyzed under the reasonableness standard of the Fourth Amendment." *Winters v. Adams*, 254 F.3d 758, 764 (8th Cir. 2001)(citation omitted). *See also, Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006).

"Police officers are liable for the use of excessive force when they use force that is not objectively reasonable in light of the facts and circumstances confronting them." *Goff v. Bise*, 173 F.3d 1068, 1073 (8th Cir. 1999)(citations omitted). In *Lawson v. Hulm*, 223 F.3d 831 (8th Cir. 2000), the court stated:

Although there can be no question that the Fourth Amendment prohibits unreasonable seizures of the person, it is also well established that "not every push or shove violates the Fourth Amendment. The applicable test is "whether the force used to effect a particular seizure is reasonable." In the context of a

-16-

claim of excessive force, the "reasonableness" inquiry must be an objective one in that the court must only evaluate "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."

The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation."

*Lawson*, 223 F.3d at 834 (citations omitted).

The use of some force by police is reasonable when an arrestee flees, resists arrest, or disobeys orders. *See e.g., Foster v. Metropolitan Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990). The lack of injury or a minor degree of injury is also relevant in determining whether the force used was excessive. *Id.* Additionally, the court may consider whether any injury suffered is explained by the arrestee's own actions. *See e.g., Greiner v. City of Champlin*, 27 F.3d 1346, 1355 (8th Cir. 1994).

In this case, the summary judgment record consists of the affidavits of the defendants, the affidavit of Haney, the affidavit of Hodges, the defendants' case reports or arrest reports, records from the SCADC, hospital records, and plaintiff's summary judgment response that is sworn to under penalty of perjury.

The parties provide somewhat contradictory versions of what occurred on April 19, 2007. However, some of the facts are uncontroverted. Woods was running, crossed the street against the traffic light, and although she initially stopped when Bolinger asked her to, she then turned away and continued running ignoring his additional commands to stop. *Resp.* at ¶ 4(B), ¶ 5, ¶ 6, ¶ 7, & ¶ 9. When Bolinger caught up with Woods, she flailed her arms at him, was yelling and

screaming, resisted efforts to be handcuffed and attempted to get away from the officers. *Resp.* at ¶ 10, ¶ 11, ¶ 12, ¶ 14(B). She was angry. *Resp.* at ¶ 13.

Although she ultimately proved not to be intoxicated, she was perceived to be under the influence of some controlled substance by the officers at the scene, refused admission at the SCADC because of her strange behavior, and suspected to be under the influence at the hospital. *See e.g., Napier's Affidavit* at ¶ 1, ¶ 3; *Resp.* at ¶ 30(A)(all the comments from ten to twelve people in the sallyport at the SCADC stating that I was high); *Resp.* at ¶ 30(B)(hospital medical personnel believed she was on something). At the hospital, five or six hospital staff members were required to hold her down in order to give her a shot of Adevan. *Napier's Affidavit* at ¶ 3. *See also Resp.* at ¶ 30(F).

Woods does not contend Napier or Bolinger continued to use force against her after she was secured and handcuffed or after she stopped resisting. While she maintains she suffered some injuries from the use of force, the injuries were as easily attributable to her conduct both at the scene and at the hospital as to the conduct of Napier and Bolinger.

Given Woods' actions, some use of force to control and restrain her was reasonable. *Crumley v. City of St. Paul*, 324 F.3d 1003, 1007 (8th Cir. 2003)("a de minimus level of force or injury is insufficient to support a finding of a constitutional violation"). As noted above, the injuries Woods suffered are as easily attributable to her own actions as to those of Napier or Bolinger. I therefore conclude Napier or Bolinger are entitled to summary judgment because the force used was objectively reasonable in light of the facts and circumstances confronting them.

AO72A
(Rev. 8/82)

## Conclusion

For the reasons stated, I recommend that the motion for summary judgment filed by separate defendant Mike Conger be granted (Doc. 24). I further recommend that the motion for summary judgment filed by separate defendants Gregory Napier and Johnny Bolinger (Doc. 18) be granted. With respect to Lou Doe, I note that despite having had the opportunity to engage in discovery Woods has failed to identify him. I therefore recommend that the complaint as against him be dismissed without prejudice.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 3rd day of September 2008.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)