IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

ELAINA WOODS                                                            PLAINTIFF

          v.                              Civil No. 07-2065

AMANDA SOWA;
DEPUTY R. COVEY; and
DEPUTY WALKER                                                          DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983. She proceeds *pro se* and *in forma pauperis*. While incarcerated at the Sebastian County Adult Detention Center, plaintiff contends excessive force was used against her. Specifically, she contends she was pepper sprayed. On July 28, 2009, an evidentiary hearing was held. At the conclusion of the hearing, the case was taken under advisement pending preparation of this report and recommendation.

### Background & Procedural History

The events at issue in this lawsuit occurred on April 19, 2007. Plaintiff alleged her constitutional rights were violated when she was falsely arrested by Fort Smith Police Officers Gregory Napier and Johnny Bolinger, and excessive force was used against her during her arrest.

A confrontation occurred between the officers and Woods during which she was attempting to proceed to school to pick up her daughter. At some point Woods urinated, soiling her own clothes and those of Bolinger. Woods was taken into custody and cited for the offenses of fleeing apprehension, refusal to submit to arrest, public intoxication, and disorderly conduct.

When the officers initially attempted to place her in the custody of the Sebastian County Adult Detention Center (SCADC), the facility refused to accept her because of her behavior.

-1-

Woods was transported to the hospital.  At the hospital a blood test was taken which ultimately showed Woods was not under the influence of any drug or alcohol.  She was given a shot of Ativan.

Woods was then taken back to the SCADC.  Following her shower, Woods contended several unidentified officers utilized pepper spray against her.  In an effort to assist Woods in identifying these officers, the court added Mike Conger, the jail administrator, as a defendant (Doc. 9).  Conger was directed to identify for the court the officer or officers who utilized pepper spray against Woods on April 19, 2007.

Conger filed a motion for summary judgment (Doc. 24).  In a report and recommendation (Doc. 33) the undersigned recommended that Conger's motion be granted.  Conger maintained there was no record of, and no recollection on the part of any officers of,  the use of pepper spray against Woods.  The report and recommendation was not adopted (Doc. 35).  The undersigned was directed to conduct further proceedings to determine if an identity could be established for the person or persons who assisted with Woods' shower, the person or persons who escorted Woods to a cell, and Woods' cellmates with whom she allegedly discussed the pepper spraying and the condition of her eyes during the remainder of her incarceration.

Woods' claims against Dr. Douglas Carson, the doctor she was treated by at the hospital were dismissed prior to service of process (Doc. 28).  Woods' claims against Bolinger and Napier were dismissed on summary judgment motion (Doc. 35).

Conger was directed to provide the court with the information (Doc. 36).  Conger submitted the affidavit of Lieutenant Gayla Jackson (Doc. 41 & Doc. 42) and indicated no officer

-2-

questioned had any recollection of an incident involving Woods and the use of pepper spray during the entire book in process.  Amanda Sowa was the intake officer and would have been responsible for showering Woods, if she showered.

A report and recommendation was filed (Doc. 43).  It recommended that the complaint against Conger be dismissed.  We noted that Conger had supplied the court with all information the court required of him and Woods had also engaged in discovery herself.  Despite this, she had been unable to identify the officers allegedly involved in the use of pepper spray.

The report and recommendation was not adopted (Doc. 48) and the undersigned was directed to substitute Deputy R. Covey, Deputy Amanda Sowa, and Deputy Walker as defendants (Doc. 48) in place of Conger.  The undersigned was directed to have an evidentiary hearing at which Woods could "question these officers personally about the alleged pepper spraying incident."  (Doc. 48 at page 4).  Covey, Sowa, and Walker were made defendants and service directed on them (Doc. 49).  Once an answer was filed an evidentiary hearing was scheduled (Doc. 50 and Doc. 51).

### **Summary of Evidence Presented**

At the evidentiary hearing, the court heard the testimony of the following witnesses:  (1) Elaina Woods; (2) Joseph Woods; (3) R., minor daughter of Woods; (4) Melinda Stephens; (5) Cynia Waller; (6) Gregory Napier; (7) Johnny Bolinger; (8) Amanda Sowa McCoy; (9) Lt. Gayla Jackson; (10) Mike Conger; (11) Deputy Irma Wade; (12) Deputy Covey; (13) Laura Bair; (14) Paul Gedeke; (15) Janie Lasiter; and (16) Deputy Walker.   For purposes of discussion, the court

-3-

will summarize in the first person the testimony given at the evidentiary hearing. For ease of discussion, the testimony will not necessarily be summarized in the order given.

### Elaina Woods

On April 19, 2007, I was on the way to pick up my daughter. I was running late. I was at the intersection of Rogers Avenue and Greenwood. I had been continually pressing the button to cross and it was not changing.

I darted across the street. Bolinger said stop. Napier came into the picture. Both talked to me. They got me to the car. They parked the car outside the Fort Smith Police Department–between the Police Department and the Sebastian County Adult Detention Center (SCADC). They left me there for about fifteen minutes.

Nurse Kratz came out. I asked Kratz if I could go to the hospital to prove they were wrong. I was not on any drugs. I was not intoxicated. I didn't have an identification bracelet on when they took me to the hospital.

I asked Napier if they were still going to pepper spray me. I said I would calm down if they gave me a blood test. Then I was held down and given a shot. I was admitted to the hospital at 4:45 p.m. I was back at the SCADC at 7:17 p.m.

As soon as I got back from the hospital, I was taken to the shower. *See Defendants' Exhibit* (hereinafter *Defts' Ex.*) 2 (listing intake time of 7:43 p.m.). I put my clothes on in the shower. I was then escorted to a small room. The room was just a few steps from the shower. I went to the right and then the room was on the right. It was a narrow room–maybe eight feet by ten feet in size.

-4-

I was pushed or shoved in a room.  I fell down.  When I was gaining my balance, I got up and was turning around.  When I got up, I was pepper sprayed.  The officers were standing in the doorway.  It was a couple of feet from where I landed to the doorway.

I walked back.  I was within a foot of the officers.  As soon as I looked up and got about chest level, I was sprayed.  I was sprayed one time.  The spray lasted a couple of seconds.  My eyes burned and I couldn't see as soon as they sprayed me.  I hit the ground screaming.  There was no talking when I was pepper sprayed.  I just saw a hand pointed out and then my eyes were burning and I couldn't see.  I was then dragged out and put in holding cell for seventeen and a half hours.  There were a couple of other females in the holding cell.  I don't know who they were.  They are not the witnesses I have here today.

I banged on the door and yelled about my Due Process rights etc.  I fell asleep for about an hour.  After that, I was let out and put in a cell with two other inmates.

My eyesight was really fuzzy.  I couldn't see who pepper sprayed me.  There were three or four officers.  To the best of my knowledge the officers were all white.  To the best of my knowledge, there was one female officer and the rest were male.  I hadn't consumed any drugs or alcohol.  However, the shot of Ativan was pretty powerful.  I was under the effects of the sedative at the time.

I asked inmates, Melinda Stephens and Cynia Waller, about the pepper spray.  How long the effects would last.

The mug shot that is defendants' exhibit three is from April 20th at 9:40 a.m. I recall it being taken.  I had to wait seventeen and one half hours to get processed in and booked in.  The

-5-

mug shot was taken the same time I was booked in. *Defts' Ex.* 3. This was after I had cleared my eyes enough from the pepper spraying to be booked in. The booking record that is defendants' exhibit 4 is when I remember being booked. It indicates a booking time of 15:29 or 3:29 p.m.

I believe they were mad because I went to the hospital and proved to them I was clean. So they didn't fill out the proper paperwork and covered up what occurred. If the proper policy and procedures were taken, there would have been documentation about the incident. I believe all the personnel conspired together to cover it up.

I bonded out on the 22nd, a little after midnight. The effects of the pepper spray were still visible. My eyes were still puffy and red. I was still cleaning gunk out of them. *See Defts' Ex.* 3.[1]

I went straight to the hospital and asked for all the forms. I never went to the doctor to seek care for my eyes. It took a few more days for the effects of the spray to wear off. They, the SCADC, have covered up the incident and lied. I have never seen the Oleoresin Capsicum (OC) administrative warning form.

### Joseph Woods

I'm Elaina's husband. Boyd and I went to get Elaina out of the detention center. Her eyes were puffy, red, and blood shot. Her eyes looked pretty much the way they do in defendants' exhibit 3; they looked glassy. Underneath and over her eyes look puffy. I can't tell on the picture if her eyes are blood shot. Your eyes don't get blood shot if you only sleep an hour; they get glassy.

---

[1]Defendants were asked to provide the court with the actual digital booking photograph so that it could be viewed on a color monitor. The digital image has been provided and is attached to this report and recommendation as Court's Exhibit 1.

I've been pepper sprayed.  I was just left to sit after it happened.  I'm not naming any names.  It has nothing to do with this.

I didn't go to see Elaina while she was at the detention center.  It wasn't visiting day.

I haven't had any felony convictions in the last ten years.  She didn't go to the hospital when she got out for medical treatment.

I had to pay a fine first and make bond before she could be released.  Some of the charges against her were dropped and some were not.

### R.  Minor Daughter of Woods

My Mother's eyes were really red and puffy underneath when she was released from jail.  The white areas of my Mother's eyes were all red.  My Mother's eyes looked the same as they did in defendants' exhibit 3.

I recall the day because my Mother came home after my step-father and uncle gathered all the money.  I looked at a bruise on my Mother's elbow that hurt.  My Mother's eyes get red if she cries but don't stay like that.

### Melinda Jan Stephens

I was in the SCADC in April of  2007.  I was in for drugs.  I can't recall your eyes or your talking about being pepper sprayed.

### Cynia Waller

I was in the SCADC in April of 2007.  I honestly don't recall you asking about being pepper sprayed.  I was in there a long time.  A lot of people came in and out.  Some came in and said they had been sprayed.  I'm assuming their eyes were red.  I just don't recall.

-7-

### Gregory Napier

I work for the Fort Smith Police Department.  On April 19, 2007, I came into contact with Elaina Woods.  When Woods was in the backseat of the patrol car, she was impossible to understand.

The jail refused Woods.  I went to the police department and waited for a supervisor to come out and advise me.  I was outside the car and could see Woods from where I was standing.

I recall Woods asking for a blood test to show that she was not high.  She repeated that probably 1,000 times.

On plaintiff's exhibit 17 her signature is not on there.  The word arrest is written on the signature line.  She was unable to sign the form.

From the arrest location, I went straight to the jail with Woods.  It took two or three minutes to go from the place of arrest to the SCADC.  When they refused her, I went to the back side of the Fort Smith Police Department.

We didn't see any visible injury on Woods.  She was not complaining of any visible injury.

I didn't see anyone pepper spray Woods.  I was unaware she was pepper sprayed until this came to light.  I heard no talk about her being pepper sprayed. I would have been gone from the detention center by the time she says the spraying incident occurred.

When we bring a prisoner to the detention center, we pull into the sally port.  We go into the detention center and fill out the probable cause form and the top part of the intake form.  We stay in the area right inside the door.  Once we are done with this paperwork, we leave.  It takes maybe ten to fifteen minutes to fill out the paperwork.

-8-

The inmates are brought into the main area and their property is taken. They are generally taken to the shower room. At the time I brought Woods in, I don't recall how many people were waiting to be booked in. I don't see the booking procedures. Bolinger was the arresting officer.

**Johnny Bolinger**

I'm a patrolman with the Fort Smith Police Department. I didn't go to the sallyport with Napier. I was changing my pants because Woods urinated on me.

Plaintiff's exhibit 23 is a copy of an affidavit for probable cause determination. I completed the top part. Plaintiff's exhibit 24 is the affidavit for probable cause determination after it has been completed and signed by the Judge.

Woods was initially charged with fleeing apprehension, refusal to submit to arrest, public intoxication, and disorderly conduct. Later in the evening when we realized there was a dent in the car door where she kicked it, we added the charge of criminal mischief.

Napier transported her to the hospital. I followed. I was not a witness or personally involved in the pepper spraying.

**Amanda Sowa McCoy**

I'm a deputy at the SCADC. I work nights. My shift is 7 p.m. to 7 a.m. I don't recall Woods or the incidents of April 19, 2007. I have no independent recollection of the night of April 19th. I have no recollection of a pepper spraying incident.

The notations on plaintiff's exhibit 26 are not my writing. I didn't take any snapshots or photographs of Woods. The booking photograph was taken during the day. *See Defts' Ex.* 3 (taken 4/20/07 at 9:40 a.m.). The intake officer is responsible for supervising the shower. I have no memory of processing Woods in.

-9-

There is a difference between intake and booking.  The intake officer takes the inmate's property and puts it in a bucket.  The police officers fill out the top part of the intake form.  *See e.g., Defts' Ex.* 2.  The intake officer fills out the bottom part of the form where it says property taken.  *Id.*  I took two purses from Woods, three rings, one lighter, etc.  *Id.*  When the inmate is booked, the booking officers record height, weight, charges, etc.

I signed the intake form.  I don't remember the interview.

I confirmed there was a city warrant on Woods for failure to pay fines.  *Plff's Ex.* 29 (last page).  Since I called, I wrote the time, 10:35 p.m. and date, April 19th.  I called the Fort Smith Police Department to obtain the information.

The length of time that expires between intake and booking depends on a number of factors including how many people are at the facility waiting to be booked, whether the inmate is intoxicated, the charges against the inmate, etc.  While an inmate is waiting to be booked, they are placed in a holding cell.  It is the booking clerks' responsibility to monitor the booking process.  I don't know who the booking clerk was on April 19th at 19:15 or 7:15 p.m. Ann Richardson was the booking clerk who booked Woods in on April 20th.

Woods did urinate on herself so we could have taken her to the shower.  If I took her to the shower, I would not have taken anyone with me unless she was giving me problems.

I would get a jail uniform and let her shower and change into the uniform.  We would be in there with her–waiting right outside the shower.  Woods would have went from the shower to a holding cell. The intake shower is five or six feet from the woman's holding tank.  The holding tank is approximately eight by ten feet.  It has a cell door which is an iron grated door, a bench,

-10-

and a bathroom.  Inmates are put in the holding cell until booked.  The cell is designated H1.  All females waiting to be booked are put in there.

If I had a pod I was assigned to, I would check on the women in the pod, do intake, answer phones.  I don't carry pepper spray.  I never have.  Any deputy who is certified can carry spray.  I have never carried pepper spray.  Other deputies carry spray.  On April 19, 2007, no female officer was certified to carry pepper spray.  Pretty much all of the male deputies are certified to carry pepper spray.  If you are present when pepper spray is used, you have to write a report about the use of the spray.  I'm sure I have written such a report.

If someone is pepper sprayed, you wait ten or fifteen minutes and offer them an opportunity to shower.  If the inmate has calmed down, you go ahead and book them in.  If the inmate is still combative, you put them in a holding cell.

No males go with the female inmates to shower.  I stick my foot in the door.

In Woods' case there was a time lapse between her intake and her booking.  She wasn't booked until the next day at 3:30 p.m.  It is normal for there to be a time lapse because intake and booking are done by different people.  For certain charges, there is a period of time you wait to book people in.  If a person is charged with driving while intoxicated (DWI), you wait twelve hours.  If a person is charged with public intoxication (PI), you wait six hours.  If the inmate is banging on the door, they don't bring the inmate out because they are being combative.  If the inmate is sleeping because she is under medication, the inmate is left alone.  If the inmate doesn't fully wake up, the inmate is left alone.

-11-

Woods was charged with public intoxication (PI). This is why 0143 is written in the upper right hand corner of her intake form. This indicated the earliest Woods could be booked in was 1:43 a.m. on April 20th. All intake forms are given to the booking officers. The booking officers know the individuals are in the holding cell.

I have taken booking pictures in the past. The booking pictures are usually taken outside the print room because there is a height chart there. This booking photo, *Plff's Ex.* 30 and *Deft's Ex.* 3, is taken up in intake beside the bench. There are three phones. She is sitting. There is a bench right under the phones. The phone is four feet off the floor.

### Boyd Williamson

I am a good friend of Woods. I bailed her out of jail with her husband on April 22nd. Her eyes were red and puffy. She also complained about her elbow being sore. Her eyes were a little more swollen than they are in the picture. *See Defts' Ex.* 3.

I've never been pepper sprayed. I have seen someone who was pepper sprayed.

I couldn't distinguish it from her being upset and crying. Woods didn't ask for medical assistance that I know of.

### Lt. Gayla Jackson

I'm employed at the SCADC. I worked there in April of 2007.

I didn't pepper spray Woods. I have no knowledge of her being pepper sprayed.

My affidavit was submitted to the court as document 41. I may have just taken the names I included off the booking log book. I know there was a reserve training going on at the same time across the street.

-12-

In paragraph ten of my affidavit I said the deputies who worked that night included Sgt. Paul Gadeke, Deputy Nancy Walker, Deputy John Dutton, Deputy Amanda Sowa, and Deputy Anthony Partain. I looked at the log book and only listed the five deputies. I had the information. The five were the ones there and in that area at the time.

I'm sure I looked it up. It has been a few months ago. The top names there are not officers. *See* Doc. 42 (booking log book attached to Affidavit of Jackson). The names appear to be inmates. They may be reporting inmates. Inmates who are authorized by the courts to report daily to the jail. Page three of six on the top is labeled 1900 to 700 Thursday April 19, 2007. This would actually be the April 20th. The top part of page three of six to page four of six would be the only part of the booking log I would have looked at. Page four of six lists Corporal Schuch and Sergeant Taulbee. I did not include them on my list because I was going off who I found was working during the time of the shower.

When I said in paragraph five of my affidavit that I had questioned all jail staff, I didn't mean I had literally questioned all jail staff. *Plff's Ex.* 45. I questioned Sowa, the sergeant on duty, Gadeke, and anyone else in his troop who would have done this, Deputy Partain, Deputy Walker, and Deputy Dutton. Ones I thought could be involved in this incident. They were the ones who were working up front. I didn't prepare any kind of report. I meant all staff I had listed and found in paragraph ten.

An attorney prepared the affidavit and I signed it. I was probably asked to look into this when Woods filed her lawsuit.

-13-

The showers are right there in intake.  If any problem arises, the deputy could call for help.  A male deputy might stand by when a female is showering.  The deputy usually stands right outside the door or across the small hallway by the intake desk.

I was not on duty that night.  My hours are eight to four.

Some female guards carry pepper spray.  I don't know if any on duty on April 19th or April 20th carried spray.

The pepper spray carried can be discharged multiple times.  If an inmate has to be OC sprayed, a written report must be filled out.  Troops have briefings.  I don't go to the briefings.  Troop sergeants hold the briefings.

An inmate exposed to OC spray is given a document called an OC administrative warning.  The inmate fills out and signs the document.  There is no document evidencing Woods was ever pepper sprayed.

All officers should document pepper spraying–not just the officer deploying the spray.  If there are two or three officers around, there should be two or three reports submitted.  Woods submitted no grievances or medical requests regarding the spraying.

If an inmate is intoxicated or combative, it will cause a delay between intake and booking.  If an inmate is combative, there might be more deputies around the shower.

The normal time between intake and booking varies with the number of people waiting.  I don't know how long it took to get Woods booked.  When Woods came back from the hospital she had been given a shot.  She may not have been calmed down.  She testified she was banging on the cell door.  If she was combative, asleep, or if they thought she was under the influence of

-14-

drugs, the booking clerks would have waited to book her.  She had a public intoxication charge so they would have waited at least six hours to book her in.

She would have been in the holding cell until booked.  We don't keep records of who is in the holding cell.  I don't know for sure why there was as much a delay in booking as there was. There is more staff during the day–fourteen and only nine at night.

I don't see any notations on her intake form.  Usually the booking clerks will make notations on the intake form as to why the inmate could not be booked.  I'm sure there was some dialog between the booking clerks about Woods but there are no notations on her intake form.  She could have been booked at any time after 1:43 a.m.  Usually it is the intake officer that keeps the inmates in a time line.  I believe Officer Dutton was the intake officer at 1:43 a.m.

I reviewed Woods' jail file to make sure no grievances were filed.  She would have a different file if she was in jail again in August.

According to defendants' exhibit 4, Woods was booked at 15:29 or 3:29 p.m. on April 20th.  Her intake time was listed as 19:43 or 7:43 p.m. on April 19th.

Her booking picture indicates it was taken at 9:40 a.m. on April 20th.  It appears to have been taken in the intake area.  I don't think the date and time is correct.  I think the picture was taken in the afternoon.  The picture has the booking number on it.  You only get the booking number once an inmate has been booked.

The information on the board on the mug shot comes from the booking sheet.  *Defts' Ex. 4*.  They normally try to put the social security number on the booking photo.  Woods' social security number is not on the booking sheet.  *Defts' Ex. 4*.

-15-

I did check and there were some other pictures taken during this same time period were the time on the digital camera was off.  By way of example, defendants submitted as defendants' exhibit 5 records indicating a female inmate booked at 14:28 or 2:28 p.m. on April 20th has a booking photo bearing a time of 8:01 a.m. and a male inmate booked at 15:10 or 3:10 p.m. on April 20th has a booking photo bearing a time of 8:32 a.m.  Inmates are photographed as the officers can get to it just like they do the fingerprints.

**Mike Conger**

When we have a lawsuit filed, it is turned over to our attorney.  The Sheriff is over the jail. I am the jail administrator.  Jackson is the assistant administrator.  I have no recollection of Woods being pepper sprayed.  I turned the matter over to Jackson.

Everyone who works at the jail has certain policies and procedures they must follow.  I have staff for that, the lieutenant and senior sergeants.  If it is a criminal issue, I turn it over to the investigative division.

I know about the booking process.  Plaintiff's exhibit 17 is a copy of Woods' citation to appear.  Plaintiff's exhibit 14A-1 is a jail incident report.  It is normal for information at the top of the incident report to be left blank if there is for example no victim etc.  At the time, Woods would not have had a booking number.  This incident report is when Woods was denied admission to the SCADC when she was initially brought there.  If an individual can't walk in on their own, have problems and need medical attention, we refuse them.

When the individual comes back in, we get the necessary information.  Sometimes the individual comes back and it may take up to twenty-four hours to book the individual depending

-16-

on their situation.  People who will answer questions and are cooperative it usually only takes thirty to forty minutes between intake and booking.

At one point, the time on the digital camera was not coordinating with the actual time.  We had to correct that.  The pictures are taken and then down loaded.

Deputies have to be certified before they can carry pepper spray.  Any use of pepper spray must be reported.

### Deputy Irma Wade

I'm a booking clerk at the SCADC.  I was employed there in April of 2007.

I work the 11 p.m. to 7 a.m. shift.  I am signed in the booking log book on page three of six.  (Doc. 42 log book page 3 of 6).

I'm not certified to carry pepper spray.  I have no recollection of Woods.  I don't recall any incident where she was pepper sprayed.

If an inmate has a public intoxication charge, you wait six hours to book them.  If an individual has a DWI charge and refuses a Breathalyzer, you wait twelve hours to book them.  If an inmate is being uncooperative and banging on the door, we don't book them until they calm down.

An inmate gets a court assignment when booked in.  So the court assignment could change depending on a delay in booking.

The intake sheets are kept in a stack.  The time is noted on it when the inmate can be booked in.  If an inmate comes in and has a signature bond, we try to book them in and get them out of there.  We usually make a notation in the remarks section of the intake sheet if the inmate is being uncooperative, sleeping, etc.  The intake sheet of that inmate then goes to the bottom of

-17-

the stack.  If there is no notation, you ask the deputies.  They communicate with each other why she hasn't been booked.  There are times we are rushed and I haven't made notations.

### Deputy R. Covey

I work at the SCADC.  I worked there in April of 2007.  I work the 0700 or 7:00 a.m. to 1900 or 7:00 p.m. shift.  It is first shift, Troop 3.

I was logged in on the booking room log on page four of six.  (Doc. 42, page four of six). I don't remember Woods.  I do recall being in charge of CD pod.  I have no memory of a pepper spraying incident on April 19, 2007.  At the time, I was not certified to carry spray.  To my knowledge a certified officer never handed pepper spray over to another officer.  The CD count I call into the control room varies by who goes in and out of my pod.

Lt. Jackson talked to me about the incident a few months ago.  I got certified in June of 2007 and carried pepper spray once and awhile.  I don't carry pepper spray now.  I've transferred to juvenile.

I have escorted females to the shower.  If a female officer called for assistance and there was not another female around, a male officer would have to go and offer assistance.  I was only involved up front if my pod was locked down and I was called up front.

### John Dutton

I am a former deputy of the SCADC.  I am now self-employed as a private investigator and process server.  In April of 2007 I was working at the SCADC.

I signed in on page two of six of the booking log.  (Doc. 42 page two of six).  I don't recall Woods.  I have no recollection of Woods being pepper sprayed.

-18-

On April 19th I was assigned to intake.  If there had been an incident, I would have done a report since intake was my area.  There were two of us.  Only female intake officers did the intake on female inmates.  Male officers did the intake on male inmates.  Intake is an open area. We help the booking clerks, work with bondsmen, etc.

I would take male inmates to the shower.  The intake shower is right across from the desk. The print room and breath analyzer machine is also in that room to the right.  I was armed with pepper spray.  You definitely have to make a report if you discharged it.  I would definitely assist if there was an incident in the print room.

### Deputy Laura Bair

I work at the SCADC.  In April of 2007 I was a booking clerk.  I worked the 3 p.m. to 11 p.m. shift.  I have no independent recollection of the incident.

I was signed in on the booking log book.  (Doc. 42 booking log book page two of six).  My desk was located about fifteen to twenty feet from the shower area.  I didn't carry pepper spray.

I have no idea who escorted Woods to the shower.  I take the intake sheets and call inmates up to do the booking.  I book males and females.  The intake officers bring the intake sheets. There should have been one other booking clerk working at the time.  The 0143 written in the right hand corner of the intake sheet, *defts' ex.* 2, means that is the earliest we could have booked Woods in.  If there is no problem or no reason to delay the person's booking, there is no notation in the right hand corner.  All the intake sheets are put in the same stack.  By 0143 or 1:43 a.m. I would have been off duty.

If I'm the booking clerk and the intake person goes to get the inmate and tells me the inmate is uncooperative, I usually make a notation.  I was taught to do that.  I make a notation on

-19-

the intake form in the remarks section.  If there isn't room there, I write it anywhere I can find

room.  I did write on this intake form.  *Defts' Ex.* 2.  I wrote on the remarks section: "added crim

mis per Off. Bolinger."

I've occasionally had it take more than twenty hours to book a person in.  Off the top of

my head I can't think of one.  That would be unusual.  It doesn't usually take that long.

### Paul Gadeke

I'm a former sergeant with the SCADC.  On April 19, 2007, I was the shift supervisor on

duty.

On April 19, 2007, I signed in on the log at 1842 or 6:42 p.m.  My shift was from 7 p.m.

to 7 a.m.   (Doc. 42 booking log book page two of six).

I don't recall Woods at all.  I have no knowledge of anyone who pepper sprayed her.  I

didn't  pepper spray her.

### Janie Lasiter

I worked at the Sebastian County Sheriff's Office in the Communications Center.  The last

page of plaintiff's exhibit 29 is a jail house inquiry.  One of my responsibilities was to pull

warrants and to confirm them.  They could put my name as the person who confirmed it.  I verbally

confirmed a warrant if I had it in hand.  There was a James Eric Lasiter who worked for the City

of Fort Smith.

I worked from 11 p.m. to 7 a.m.  I sometimes came in at 10:15 p.m.  This is a city warrant.

We only held felony warrants for the city.  Sometimes I might call the city and confirm a warrant

through the city to the officer.

***Deputy Nancy Walker***

I worked at the SCADC.  I worked the 7 p.m. to 7 a.m. shift.  On page one of three of the control room log I signed in at 1900 or 7 p.m.  (Doc. 42).  When you are in the control room, you have to write your name.

There was a female deputy assigned to CD pod.  We covered each other.  We made sure the watch tours were covered.

In April of 2007, I didn't carry pepper spray.  I do not recall any incident where Woods was pepper sprayed.  I don't recall Woods at all.  Any use of pepper spray had to be reported even if you were not the one using it.

If intake needed help, I might go take someone to the shower.  I can recall having a male stand outside the shower when I had a disruptive female and needed assistance.  Just any available male deputy could assist.

## Discussion

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988).

It is clear the state has no right to punish pretrial detainees. *See Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989)(*citing Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979)).  Excessive force claims brought by pretrial detainees are

-21-

analyzed under the Due Process Clause of the Fifth and Fourteenth Amendments. *See Johnson-El*, 878 F.2d at 1048-49.

The courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees. *See Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard."). The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *See Schoemehl*, 878 F.2d at 1048. The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

In this case, Woods contends force was used against her when pepper spray was utilized against her after her intake shower. She maintains she was escorted a few feet, shoved into a room, sprayed, and then taken from that room to a holding cell, and left in there for a little over seventeen hours.

While the evidence did establish there was a delay in booking Woods, due at least initially to the SCADC's rule that an individual with a public intoxication charge could not be booked for at least six hours, the reason for the delay after 1:43 a.m. was not documented. However, Woods herself testified she was banging on the door of the cell and yelling. The booking center clerks who testified indicated one of the reasons to delay booking an individual was if they were being combative.

-22-

I find Woods failed to prove by a preponderance of the evidence that Sowa, Covey, or Walker used excessive force (*i.e., the pepper spray)* against her, were involved in the use of excessive force against her, or were even aware of the use of excessive force against her.

Woods maintains the damage to her eyes is still visible on the booking photo. However, this damage is not apparent to the court. Additionally, Woods' cell mates, Melinda Stephens and Cynia Waller, could not recall her having been pepper sprayed, having spoken of it, or having asked questions about being pepper sprayed. One of the individuals who picked Woods up from jail when she was released, Boyd Williamson, also testified he could not tell the difference from her eyes being red from her being upset and crying as opposed to them being red from having been pepper sprayed.

More importantly, whether or not Woods was in fact pepper sprayed, she failed to establish Sowa, Covey, or Walker were involved in the incident in anyway. Without proof of their personal involvement or knowledge of the event, they cannot be held liable. "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990). *See also Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985)(claims not cognizable under § 1983 where defendant was not personally involved in and did not have direct responsibility for the incidents that injured plaintiff).

## Conclusion

For the reasons stated, I recommend judgment be entered in the defendants' favor and this case be dismissed with prejudice.

-23-

The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 15th day of September 2009.

/s/ *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

-24-